**UNITED STATES of America, Plaintiff,**

v.

**Pablo ESCOBAR and Dandeny Munoz Mosquera, Defendants.**

No. 91 CR 1285 (S–2) (SJ).

United States District Court,
E.D. New York.

Jan. 18, 1994.

Zachary W. Carter, U.S. Atty., E.D.N.Y. by Cheryl L. Pollak, Asst. U.S. Atty., Brooklyn, NY, for plaintiff.

Richard Jasper, New York City, for defendant.

*MEMORANDUM AND ORDER*

JOHNSON, District Judge.

Before the Court are pre-trial motions made by defendant Dandeny Munoz–Mosquera ("Defendant"), and one cross-motion by the United States of America ("Government"). The defendant moves (1) to exclude evidence of threats made by defendant against judges, prosecutors and other public officials; (2) to recuse the Court, all Judges in the Eastern District of New York and the Prosecutor assigned to his trial in the event his motion to exclude evidence of threats is denied; (3) to exclude evidence that the defendant plotted an escape from the MCC; (4) to Suppress: (a) Statements made by the defendant in September and October, 1991; (b) Statements made by the defendant to a fellow inmate in October and November, 1992; (c) Defendant's statements taken by the government allegedly in violation of the Code of Professional Responsibility; (d) Statements made by defendant over the telephone and intercepted by the government in October and November, 1992; (e) Statements made by an alleged co-conspirator; (f) Statements made by defendant to DEA agents on or about August 12, 1992, allegedly in violation of defendant's right to *Miranda* warnings; (5) to order the Government to supply *Brady* and other discovery material to the defendant forty-five days prior to trial; (6) for a *Wade* hearing to ascertain the circumstances of an out of court identification of the defendant.

The government cross-moves for an anonymous and partially sequestered jury at trial.

## BACKGROUND

The government alleges that the defendant is a dangerous, ruthless assassin and a member of the Columbian Medellin drug cartel. He is charged under the Racketeer Influenced and Corrupt Organizations Act ("RICO") with engaging in the conduct of a racketeering enterprise, engaging in a continuing criminal enterprise, conspiracy and various substantive counts of narcotics distribution and importation. He is also charged with placing a bomb on an Avianca Airliner, which exploded killing one hundred ten (110) people, including two Americans.

The defendant's first contact with United States government officials came on or about September 25, 1991, when he was arrested and charged with making a false statement to a government official in violation of 18 U.S.C. § 1001. He was indicted on this charge on October 8, 1991, and tried on

November 25, 1991, *United States of America v. Mosquera*, 91–Cr–1075 (Weinstein, J.). A federal jury found him guilty on November 26, 1991. On March 10, 1992, he was sentenced to the maximum possible term of incarceration: six years. The defendant was sent to the Federal Penitentiary at Marion, Illinois to serve his sentence.

On November 22, 1991, while the false statement charges were pending against him, a Grand Jury in the Eastern District of New York returned an unrelated indictment charging the defendant and Pablo Escobar with conspiracy to distribute narcotics in violation of 21 U.S.C. §§ 960(b)(1)(B)(ii), 963 and 18 U.S.C. § 3551 *et seq.* This indictment was sealed. On August 2, 1992, a superseding indictment was filed charging the defendant with conspiracy, engaging in the conduct of a racketeering enterprise, engaging in a continuing criminal enterprise, conspiracy and various substantive counts of narcotic distribution and importation in violation of 18 U.S.C. §§ 1963 and 3551 *et seq.,* and 21 U.S.C. §§ 841(b)(1)(A)(ii), 846, 848(a) and (c), 960(b)(1)(B)(ii), and 963. This indictment was also sealed. On August 13, 1992, a second superseding indictment charging the same crimes as the two previous indictments but adding additional counts was filed and the defendant was arraigned on all three indictments at this time. A third superseding indictment was filed on June 16, 1993, charging the defendant with the crimes he is accused of in the instant matter and defendant was arraigned on June 25, 1993.

The defendant was in custody in Nine South at the Metropolitan Correctional Center ("MCC") in New York from September, 1991, until March, 1992.[1] While in Nine South, he met and became friendly with another inmate named "Scorpion".[2] The defendant discussed with Scorpion his role in the Medellin Drug Cartel and illegal acts he committed in Columbia, and told Scorpion that Pablo Escobar was his "main boss." The defendant asked Scorpion about the possibility of escaping from the MCC. He told Scorpion that he had friends in Queens who had access to drugs and weapons and that they would help him escape. Scorpion passed this information on to another inmate and that inmate, a government informant, passed it on to government authorities.

Subsequently, an agent of the Drug Enforcement Administration ("DEA"), spoke to Scorpion about the defendant's anticipated escape attempt. Plans were made for Scorpion to introduce an undercover agent to the defendant to aid him in his escape. Scorpion was specifically instructed not to discuss the defendant's pending false statement charges while talking with him. As a result of Scorpion's contacts with the defendant, telephone conversations between the defendant and an undercover agent were eventually recorded. The defendant thereafter decided to postpone his escape plans and was subsequently transferred to the Federal Penitentiary at Marion, Illinois.

On August 12, 1992, the defendant was returned to the Eastern District of New York to be arraigned on the original and two superseding indictments in the instant case. The defendant was escorted from Marion to the Eastern District by DEA agents. In the holding pens at the Eastern District, and prior to his arraignment on the drug and conspiracy charges, the defendant is alleged to have made several incriminating statements to DEA agents. The government asserts that he was read his rights before he made these statements. The defendant denies that he was read his *Miranda* rights. After he was arraigned, on August 13, 1992, the defendant was returned to Marion, Illinois.

On October 15, 1992, the defendant was again brought back to MCC where he remained until November 30, 1992. Before he

---

1. Nine South is a segregation unit at MCC for high risk inmates. The defendant was designated high risk and housed in this unit because he had previously escaped from two Columbian jails and was wanted for murder in that country.

2. Scorpion was placed in Nine South because a hacksaw blade was discovered in his sneakers on an earlier occasion in an apparent escape attempt.

arrived at MCC, another inmate ("CW") had been housed in Nine South, because, while in custody, he had a positive urinalysis for marijuana. CW, a sentenced federal prisoner, was also a government informant in another case. The defendant and CW met and began having conversations in which the defendant told CW that Scorpion would be testifying against him. The defendant asked CW about the whereabouts of Scorpion. He also told CW about the best drug smuggling routes into the United States from Colombia, described the war between the Medellin and Cali drug Cartels, and told CW about Pablo Escobar and his role as Escobar's "enforcer". The defendant told CW that he intended to kill a number of people, including prison officials, judges and prosecutors. CW notified an investigator from the U.S. Attorney's Office from the Southern District of New York of the content of these conversations. As instructed, CW continued to listen to the defendant's threats. The defendant asked CW to make several phone calls on his behalf to facilitate these assassination plots. Arrangements were made to have one of these conversations recorded. Prior to the recording of the defendants conversations, CW was specifically admonished to discuss only the defendant's threats and not to ask him any questions about the charges pending against him.

After listening to one of the defendant's recorded conversations, an Assistant United States Attorney (AUSA) from the Eastern District of New York who had no connection with his prosecution visited the defendant. The AUSA specifically admonished the defendant to cease making death threats. He was warned of the ramifications if he should attempt or be successful in carrying out any of these criminal acts. The defendant was not questioned about his pending case at that time and the only statement he made was a denial that the voice on the tape recorded conversations was his.

## DISCUSSION

### *MOTIONS TO EXCLUDE EVIDENCE OF THREATS, RECUSE THE COURT AND DISQUALIFY THE TRIAL PROSECUTOR*

Defendant moves for an Order prohibiting the government from offering in its case-in-chief evidence that the defendant threatened the lives of a prosecutor (AUSA Pollak), Judges (Weinstein and Johnson) and other public officials involved in the case against him, and prohibiting the government from offering evidence of his plot to escape from the MCC. In addition, the defendant seeks to have all of the judges from the Eastern District of New York recused from hearing this matter should his motion to exclude evidence of threats be denied. For the following reasons, the defendant's motions to exclude evidence of threats and attempt to escape from MCC are granted, and, therefore, his motion to recuse all of the judges of the Eastern District is moot.

The admissibility of the evidence of defendant's threats against public officials involved in this action and his attempt to escape from MCC is governed by Federal Rule 404(b) which provides, in relevant part, that evidence of other crimes or wrongs "is not admissible to prove the character of a person in order to show action or conformity therewith." Rule 404(b) does permit the introduction of such evidence for "other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." In the instant case, the defendant is not charged with threatening public officials or attempting to escape from lawful custody.

■ The admissibility of evidence pursuant to Rule 404(b) is governed by a test outlined in *Huddleston v. United States*, 485 U.S. 681, 687–88, 108 S.Ct. 1496, 1500–01, 99 L.Ed.2d 771 (1988). First, the evidence sought to be admitted must be introduced for a proper purpose relevant to the crime for which the defendant is on trial. Next, the evidence must be more probative than prejudicial. Finally, the evidence must be admitted with limiting instructions to the jury, if requested.

■ The government argues that evidence of defendant's threats against United States government officials is directly probative of the terrorism against government officials

with which the defendant is charged in the indictment. Paragraph Five (5) of the current Indictment charges that the Medellin Cartel used violence and terrorism against government officials to create the appearance that the Cartel was in control of Columbia. The acts charged in the indictment, however, are acts against Columbian officials, not United States officials. There are no charges that defendant committed acts of terrorism against United States government officials nor that he attempted to escape from prison, therefore, evidence of these threats or attempts is inadmissible pursuant to Rule 404(b).

■ The government additionally alleges that evidence of defendant's escape plot is directly probative of defendant's involvement in a conspiracy. . As the Court will discuss in more detail later, the defendant's involvement in the conspiracy ended at the time of his incarceration. The escape plot therefore occurred after his participation in the conspiracy ended. Such evidence, therefore, may not properly be introduced.

Having excluded the evidence of threats, the Court need not consider the defendant's motion to recuse all of the judges of the Eastern District from hearing this action nor defendant's request to disqualify the prosecutor who was threatened from serving on the prosecution team in this matter.

### MOTIONS TO SUPPRESS

A. *Statements made to an Informant and Agent While Defendant was in Custody at MCC During September–October, 1992*

While he was in custody at the MCC during September and October, 1991, awaiting trial on the false statement charges and prior to his arraignment in the instant action, the defendant made certain statements to another inmate, Scorpion, and to an undercover DEA agent. The conversations and statements the defendant made concerned his plans to escape from MCC and his association with the Medellin Cartel. One of the conversations with the agent which took place by telephone was recorded.

■ The defendant argues that any statements he made to Scorpion and the undercover agent must be suppressed because these statements were made in the absence of counsel, counsel having been retained in an unrelated matter. The defendant asserts that the use of these statements violates his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to counsel.

The admissibility of statements made during the conversations between Scorpion, the DEA agent and the defendant during the September–October, 1991, period is governed by *Illinois v. Perkins,* 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). The Supreme Court in *Perkins* held that "conversations between suspects and undercover agents do not implicate the concerns underlying *Miranda.* The essential ingredients of 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate.... *Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner." *Id.* at 296–97, 110 S.Ct. at 2397.

The *Perkins* Court rejected the defendant's claim of denial of his Sixth Amendment right to counsel in a situation similar to the instant case. Although in custody on another charge, the defendant had neither been arraigned nor had retained a lawyer on the matter for which the admission of statements was sought. The Supreme Court in *Perkins* reaffirmed its holding in *McNeil v. Wisconsin,* —— U.S. ——, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), that a defendant's right to counsel during a custodial police interrogation is "offense specific". *Id.* —— U.S. at ——, 111 S.Ct. at 2207.

The defendant in this action does not dispute that the Sixth Amendment right to counsel is "offense-specific," however, he asserts that implicit in the invocation of the

right to counsel is the invocation of the Fifth Amendment right against self-incrimination which is *not* "offense-specific." The defendant argues that by invoking his right to counsel in the action against him on false statement charges, he implicitly invoked his right against self-incrimination for both the false statement action and the instant matter. The defendant does not, however, cite any authority for this novel proposition.

It is clear from the Supreme Court's decision in *Perkins,* as well as from the facts of the instant case, that the defendant was protected by neither the Sixth Amendment right to counsel nor the Fifth Amendment right against self-incrimination at the time he had conversations with a government agent and an informant in September and October, 1991. Defendant's motion to suppress statements made to Scorpion and a DEA agent during this period is denied.

### B. Informant CW Statements

On October 15, 1992, the defendant, after being brought to New York from Marion, was again incarcerated at MCC. He was once again housed in Nine South, the segregation unit. There he met and had conversations with another inmate, CW. CW was also housed in Nine South for security reasons. The defendant talked to CW about his background and his activities in Columbia. The defendant told CW he was going to kill certain government officials involved in the case against him. He asked CW to make phone calls for him to facilitate these threats. CW subsequently reported the threats to government officials, who arranged to monitor the defendant's conversations. CW was specifically instructed not to question the defendant about the charges pending against him, only to listen to his statements about the death threats. As a result of CW's reports to government officials, at least one of the defendant's threats was subsequently recorded.

After the recording was made, an AUSA, with no connection to the instant prosecution, visited the defendant at MCC with prison officials and DEA agents. The AUSA did not question the defendant, but did advise him to cease his death threats. The defendant was also warned of the ramifications should he undertake any criminal act or obstruction of justice. The only statement the defendant made at that time was a denial that the voice on the tape that was played for him was his. The government states that it does not intend to use this statement in its direct case.

■ The defendant asserts that, since he was represented by counsel at the time of his conversations with CW, his Sixth Amendment right to counsel was violated by these conversations. The Supreme Court has held that, in a situation similar to this one, a defendant's statements which are "spontaneous" are not violative of the Sixth Amendment. A defendant must demonstrate that the police and their informant took some action, beyond merely listening, deliberately designed to elicit incriminating remarks. *Kuhlmann v. Wilson,* 477 U.S. 436, 459, 106 S.Ct. 2616, 2629–30, 91 L.Ed.2d 364 (1986). In addition as discussed earlier, the defendant was represented by counsel on unrelated charges, therefore, his Sixth Amendment right to counsel had not been invoked as to the threats against public officials.

The government took precautions to ensure that the defendant's Sixth Amendment right was not violated. CW was specifically instructed not to question the defendant, only to listen for evidence of new crimes, specifically the defendant's plans to murder public officials. As the defendant made spontaneous statements about acts unrelated to those for which he was represented by counsel, there was no Sixth Amendment violation.

Defendant's motion to suppress the statements made to the informant CW is denied.

### C. Statements Obtained In Violation Of The Code Of Professional Responsibility

■ The defendant asserts that all conversations he had with agents or informants

after his arrest in September 1991 should be suppressed as taken in violation of DR7–104(A)(1) of the Code of Responsibility.

■ As discussed above, no right to counsel had attached in regard to the matters which the government was investigating. The Code of Professional Responsibility DR7–104(A)(1) restricts a lawyer's communication with a client known to be represented by counsel. That restriction, however, does not apply to communications which occur before the initiation of criminal proceedings. *United States v. Ryans*, 903 F.2d 731 (10th Cir.) *cert. denied*, 498 U.S. 855, 111 S.Ct. 152, 112 L.Ed.2d 118 (1990). In the instant case, the government was investigating new crimes and allegations. There was no violation of the Code of Professional Responsibility in communications between the defendant and government agents.

### D. Intercepted Communications

■ The defendant moves to suppress additional statements recorded by the government, alleging that the statements were taken in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2515 *et seq.* ("Title III"). The government argues that Title III applies only where there is a legitimate expectation of privacy, and that a prisoner has no such expectation when using a prison telephone. In addition, the government asserts that the conversations on the prison telephone are admissible pursuant to two statutory exceptions to Title III: first, the taping was done by a law enforcement officer in the ordinary course of his duties, as permitted by Section 2510(5)(a)(ii) of Title III and, second, one of the parties has given his or her consent to the interception of the communications, as permitted by Section 2511(2)(d) of Title III. 18 U.S.C. §§ 2511(2)(d), 2510(5)(a)(ii).

■ The law of this Circuit is clear that there is no legitimate expectation of privacy in communications from prison phones and, specifically, that prisoners' consent to interception of calls from the phones at MCC may

be implied. In *United States v. Willoughby*, 860 F.2d 15, 20 (2d Cir.1988), the Second Circuit held that the policy and practice at the MCC was such that the inmate's consent to the interception of his communications may be implied. *Id., See also United States v. Amen*, 831 F.2d 373, 378–79 (2d Cir.1987), *cert. denied sub nom Abbamonte v. United States*, 485 U.S. 1021, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988). The Second Circuit found that the MCC posted notice of its policy of recording inmate calls, and inmates had ample notice of this practice. Thus, the defendant's calls made from the MCC's phones were made with implied consent to the monitoring and taping of the conversations, and with no legitimate expectation of privacy.

■ In addition, intercepted communications involving a party acting under color of law or who has given prior consent to the interception are admissible pursuant to Title III. *See* 18 U.S.C. § 2511(2)(c); *United States v. White*, 401 U.S. 745, 751–52, 91 S.Ct. 1122, 1126, 28 L.Ed.2d 453 (1971). The intercepted communications at issue were made during conversations with a government agent, an inmate-turned-informant and another government witness. One of the participants in the conversations was therefore acting under color of law and had given prior consent to the interception of the transmission.

The oral communications intercepted by the government are thus admissible under Title III.

### E. Co–Conspirator Statements

■ On June 11, 1992, Oscar Isaza, an alleged co-conspirator of the defendant, had a conversation with a confidential informant; that conversation was recorded. Isaza at that time identified the defendant as the person responsible for the bombing of the Avianca airliner. The government alleges that Isaza at that time was a member of the Muñoz–Escobar conspiracy and that his statements were made in furtherance of said conspiracy. The defendant objects to the

**1528**

admission of this testimony and requests a hearing on its admissibility.

■ Statements of a co-conspirator made during the time a defendant was a member of a conspiracy and in furtherance of the conspiracy are generally admissible against that defendant. The Second Circuit in *United States v. Lieberman*, 637 F.2d 95, 102 (2d Cir.1980), held the statements of a co-conspirator in furtherance of a conspiracy to be admissible against his co-conspirator if both the declarant and the defendant were members of the conspiracy at the time the statements were made.

The issue before the Court is whether or not the declarant Isaza was a co-conspirator of the defendant at the time the statements were made and whether such statements were made in furtherance of said conspiracy. The Court must first determine whether the defendant was a member of a conspiracy, if it existed, after his arrest in September, 1991. If the answer to this question is in the affirmative, the next question is whether Isaza made his statement in furtherance of the conspiracy.

The Court finds that on the facts of this case, the arrest and incarceration of the defendant in September, 1991, terminated his involvement in the conspiracy.

■ The Second Circuit has held that the arrest of one conspirator may constitute that conspirator's withdrawal from the conspiracy. *United States v. Cruz*, 797 F.2d 90, 98 (2d Cir.1986). While the arrest and incarceration of a conspirator does not always constitute withdrawal from the conspiracy, there is a rebuttable presumption that incarceration constitutes withdrawal by that conspirator. *United States v. Castellano*, 610 F.Supp. 1359, 1419 (S.D.N.Y.1985); *See Generally United States v. Borelli*, 336 F.2d 376, 390 (2d Cir.1964), *cert. denied sub nom. Cinquegrano v. United States*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). ("The unlikelihood of the other conspirators' relying for further aid on a person known to be confined for the very offense in which they were engaging makes such confinement a sufficient 'affirmative act' to sustain the defense of withdrawal"). Whether or not the arrest and incarceration of a conspirator constitutes withdrawal may be determined by the facts of the case. *United States v. Panebianco*, 543 F.2d 447, 454 n. 5 (2d Cir.1976), *cert. denied sub nom. Anatala v. United States*, 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977).

It seems to the Court almost impossible that the defendant could have continued to participate in the conspiracy after his incarceration. Due to the seriousness of the charges against him and his criminal history in Colombia, the defendant is, and has been imprisoned all along under the highest security arrangements. The defendant is closely supervised at every moment, and is extremely limited in his telephone and personal contacts. Those contacts, when they occur, are tightly monitored by federal officials. Given the security surrounding the defendant, it is practically inconceivable that he could continue to communicate with and participate in the Medellin Cartel. This is not to imply, however, that the Court finds that the conspiracy itself terminated at that time, only the defendant's involvement in such conspiracy was terminated by his arrest.

Because the statements which the government seeks to admit were made after the defendant had legally withdrawn from the conspiracy, they may not be admitted as co-conspirator statements made in furtherance of the conspiracy.

*F. Statements Made to DEA Agents*

■ Finally, the defendant moves to suppress statements he made to DEA agents while being transported from the MCC to Marion, Illinois, on or about August 12, 1992. The defendant asserts that the statements should be suppressed; first, because he was not apprised of his Constitutional rights prior to questioning, second, because the statements were not made voluntarily and finally, because the statements were taken in violation of his Sixth Amendment right to counsel.

There is a dispute as to whether the defendant was apprised of his Constitutional rights at the time of the questioning by the DEA agents. The defendant asserts that he was not apprised of his *Miranda* rights at that time; the government argues that he *was* apprised of his rights in Spanish and that he indicated that he understood his rights prior to questioning. This issue can only be resolved after further development of the facts in a hearing.

Next, the defendant asserts that his statements were coerced. The defendant argues that the agents acted improperly in telling the defendant that he would face the death penalty if convicted, and that this coercion caused him to break down and give the statements to the agents. The government argues that the statements were made voluntarily and without coercion.

Finally, the defendant asserts that these statements, like the statements made during his incarceration at the MCC, were made in the absence of counsel, but while he was represented by counsel in a prior proceeding. While this issue was decided by the Court in regard to the statements made while the defendant was at the MCC, the Court will reserve judgment on this issue for the purposes of the statements made on August 13, 1992, pending the resolution of the issue of whether the defendant was apprised of his constitutional rights.

The Court will reserve judgment on the defendant's motion to suppress these statements, and will hold a hearing to determine whether the statements were taken in violation of the defendant's constitutional rights.

### MOTIONS TO COMPEL DISCLOSURE

A. *Impeachment Material in Advance of Trial and Brady Material 45 Days Prior to Trial*

█ Defendant seeks disclosure of discovery materials the government has not yet produced, including the disclosure of *Brady* material no later than 45 days prior to trial.

█ Pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the government is required to turn over all potentially exculpatory material in its possession. Material required to be produced pursuant to *Brady v. Maryland* need not be produced at a specific time, but only sufficiently in advance of trial that it might be used effectively. *United States v. Payden,* 613 F.Supp. 800, 821 (S.D.N.Y.1985).

The government acknowledges that it is aware of its *Brady* obligations and will comply if any such material is discovered. Any disputed material will be turned over to the Court for an *in camera* review. The Court will not impose a specific time by which the government must produce *Brady* material.

The government asserts that it has no *Brady* material and the information that the defendant seeks is not *Brady* material but material related to the impeachment of witnesses.

█ Evidence which is not exculpatory, but relevant for the purposes of impeachment, must be produced to the defense, but need not be turned in advance of trial. *United States v. Nixon,* 418 U.S. 683, 701, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974).

The government states that it is aware of its obligation to disclose impeachment material concerning witnesses, and will do so at the time a witness testifies or in some instances prior such testimony. Specifically, the government agrees to turn over to the defendant, at the beginning of the trial, impeachment materials relating to cooperating witnesses who are living in secure locations. The impeachment material for witnesses who are living in the community and whose safety is an issue will be turned over during or after that witness testifies. Thus, the government has agreed to fulfill its discovery obligations concerning *Brady* and impeachment material.

The defendant's motion for the disclosure of impeachment material in advance of trial and of *Brady* material at least 45 days prior to trial is denied.

### B. Agents' Personnel Files

■ The defendant moves to have the government inspect the personnel files of its testifying agent-witnesses to ascertain whether the files contain information that should be disclosed to the defense. *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991) *cert. denied* — U.S. ——, 112 S.Ct. 1588, 118 L.Ed.2d 306 (1992).

■ The government must disclose to the defendant the existence of any favorable evidence on the issue of the defendant's guilt. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). However, "a prosecutor is not constitutionally obligated to obtain information outside of his files for the purpose of discovery information which defense counsel can use in impeaching the credibility of a prosecution witness." *Morgan v. Salamack*, 735 F.2d 354, 358 (2d Cir.1984). Notwithstanding *Henthorn*, the rule in this Circuit is that while other federal agencies may have files containing impeachment materials which the prosecutor would be required to produce if they were in his or her own files, the prosecutor is not responsible for knowing what is in the files of other agencies *United States v. Stofsky*, 527 F.2d 237, 244 n. 7 (2d Cir.1975) *cert. denied sub nom Hoff v. United States* 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976).

The defendant has made no showing, indeed, he does not even allege that any of the personnel files of the testifying agent-witnesses contain impeachment materials.

The defendant's application for the disclosure of materials from the personnel files of testifying agent-witnesses is denied.

### C. Interview Notes

■ The defendant seeks disclosure of interview notes taken by agents and Assistant United States Attorneys during their interviews of potential witnesses. The government agrees to preserve such notes, however, it has declined to produce them to the defendant since, it asserts that they are not "substantially verbatim" recitations of statements of witnesses and are therefore outside the scope of discovery required by Rule 16 and 18 U.S.C. § 3500(e).

■ Only "substantially verbatim" transcripts of witness statements are discoverable by the defense. Pursuant to 18 U.S.C. § 3500, the government is required to turn over to the defense any statements which are related to the subject matter of the witness' testimony. For the purposes of this statute, a "statement" includes a transcription of "a substantially verbatim recital of an oral statement ... recorded contemporaneously with the making of such oral statement." 18 U.S.C. § 3500(e).

While the government asserts that the requested notes are not "substantially verbatim" transcripts of witness statements, the Court cannot make that determination without a review of these notes. The government has offered to turn over to the Court for *in camera* inspection, government attorneys' and agents' notes of conversations with testifying witnesses. The Court will then determine whether these notes contain substantially verbatim statements of these witnesses such that they must be turned over to the defense.

The defendant's motion for an Order requiring the government to turn over notes of interviews with witnesses is denied. The Court will review these notes and make a determination as to their discoverability on a case-by-case basis.

### THE DEFENDANT SEEKS AND THE GOVERNMENT CONSENTS TO A *WADE* HEARING ON THE OUT-OF-COURT PHOTO IDENTIFICATION OF VARIOUS WITNESSES PRIOR TO THE TIME THAT THE WITNESSES TESTIFY

■ The defendant has requested and the government has consented to a *Wade*[3]

post-indictment identifications.

---

3. *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) set standards for

hearing on out-of-court identifications. The question for the Court is when and how this hearing should be conducted.

The defendant requests a pre-trial hearing on the admissibility of the testimony of identifying witnesses. The government, citing issues of security, requests a bifurcated hearing, the first part occurring prior to the start of the trial, the second part prior to the testimony of each identifying witness.

The government asserts that the security concerns pertaining to this defendant and the witnesses against him would make it extremely risky to hold hearings on out-of-court identifications prior to trial. The government instead proposes a bifurcated process, in which an initial hearing is held prior to trial and a second hearing, if necessary, is held prior to each witness' testimony.

■ The first portion of the bifurcated hearing would be an opportunity for the defendant to prove that the out-of-court identification procedures were impermissibly suggestive. The defendant bears the initial burden of proving the impermissibility of the out-of-court identification procedures. *See United States v. Jakobetz,* 955 F.2d 786, 802–03 (2d Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992). Only if the Court determines that the procedures used for the out-of-court identifications were not impermissibly suggestive, does the Court undertake further analysis of the admissibility of the identifications.

The second step in the analysis, and the second portion of the hearing, would determine the reliability of each witness' identification. The factors to be considered in this step of analysis, as laid out by the Supreme Court in *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), go to the individual witness's knowledge and certainty in the process of identifying the defendant.

The witnesses whose testimony would be the subject of a *Wade* hearing are inmates in various federal facilities. The security risks inherent in bringing the witnesses in for a hearing prior to the trial and again for testimony during trial are substantial. The bifurcation of the *Wade* hearing would allow the first step of the analysis, that is whether or not the procedures were permissible, to proceed without bringing in the witnesses. Only if the procedures were permissible would the witnesses be called to testify in a second hearing to determine the admissibility of their statements.

For issues of security and the related issues of expense, the defendant's motion is denied, and a bifurcated hearing will be held. The first part of the hearing will be held in advance of trial, the second part, if necessary, will be held prior to the proposed testimony of each witness.

## MOTION FOR AN ANONYMOUS AND PARTIALLY SEQUESTERED JURY

■ The government seeks an anonymous and partially sequestered jury because the defendant is dangerous and participated in such terrorist acts as bombing a civilian airliner. The defendant opposes such request, arguing that such measures would erode the defendant's presumption of innocence at trial.

■ It is settled that the Courts have a recognized duty to take whatever steps are necessary to protect juries from improper interference and to ensure an impartial verdict. *United States v. Borelli,* 336 F.2d 376, 392 (2d Cir.1964), *cert. denied sub nom Cinquegrano v. United States,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). Anonymous juries are often necessary to protect the integrity of trials and to ensure an impartial jury. *United States v. Persico,* 832 F.2d 705 (2d Cir.1987), *cert. denied,* 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988); *United States v. Tutino,* 883 F.2d 1125 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990).

■ A federal court may empanel an anonymous and sequestered jury under certain circumstances. The Court must consider, first, whether the defendant is dangerous based upon his history and the charges against him, *United States v. Barnes,* 604 F.2d 121, 141, (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980), and second, whether the defendant has the means to, or has previously attempted to, interfere with or cause interference with the jury. *See United States v. Thomas,* 757 F.2d 1359, 1365 (2d Cir.) *cert. denied sub nom Fisher v. United States,* 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985).

Courts have recognized that where anonymity and sequestration are necessary, jurors receive instructions explaining the measures in a neutral way to prevent any negative inference from being drawn by the jury. Most commonly, courts have explained to jurors that their privacy and identities need protection from the media and the curious, which only anonymity can provide. *United States v. Tutino,* 883 F.2d 1125, 1133 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990). *United States v. Ferguson,* 758 F.2d 843, 854 (2d Cir.) *cert. denied,* 474 U.S. 1032, 106 S.Ct. 592, 88 L.Ed.2d 572 (1985).

In support of its application for an anonymous and sequestered jury the government points to evidence of the defendant's dangerousness and ability to interfere with the jury. As evidence of the defendant's dangerousness the government directs the court to evidence introduced at a *Fatico*[4] hearing held before Judge Weinstein. At that hearing, Columbian National Police Officials introduced certified court files from Columbia showing that the defendant had been convicted of armed bank robbery, had twice escaped from jail (once using a helicopter), was wanted for murder and had been arrested for possession of firearms that are only legally accessible to members of the Columbian military. Moreover, the government points to taped conversations of the defendant in which he indicates that he wished to kill United States district judges and other government officials.

In addition, it is anticipated that there will be extensive press coverage of this matter when it finally comes to trial. Though sequestration is an extreme measure, when the media attention paid a case is expected to be exceptional, sequestration may be proper. *See United States of America v. Frank Locasio and John Gotti,* 6 F.3d 924 (2d Cir.1993).

Given the nature of the charges, the notoriety of the defendant and the physical layout of the courthouse, the Court grants the government's motion for an anonymous jury and orders that the jurors be picked up at some point away from the courthouse and transported to and from the courthouse by limousine. While in the courthouse, the jury should remain sequestered under the protection of the United States Marshals.

The government's motion for an anonymous and partially sequestered jury is granted.

## CONCLUSION

The defendant's motions to exclude evidence of threats and of an escape plot by the defendant is GRANTED;

The defendant's alternative motions to recuse the Judges of the Eastern District of New York and the prosecutor are MOOT;

The defendant's motions to suppress statements taken in violation of his Fifth and Sixth Amendment and in violation of the Code of Professional Responsibility are DENIED;

The defendant's motion to suppress or exclude the statements of an alleged co-conspirator is GRANTED;

---

4. *See United States v. Fatico,* 579 F.2d 707 (2d Cir.1978), *cert. denied* 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980).

The Court will hold a hearing on the admissibility of statements made by the defendant to government agents on or about August 13, 1992, and thus reserves judgment on the defendant's motion to suppress these statements;

The defendant's motion for an Order requiring the government to turn over *Brady* material forty-five days in advance of trial is DENIED;

The defendant's motion for an Order requiring the government to turn over government attorneys' and agents' notes of interviews with government witnesses is DENIED;

The defendant's motion for an Order requiring the government to turn over government agent-witnesses' personnel files is DENIED;

The defendant's motion for a *Wade* hearing prior to trial is DENIED;

The government's motion for a bifurcated *Wade* hearing is GRANTED;

The government's motion for an anonymous and partially sequestered jury is GRANTED.

SO ORDERED.