**Freddy GONZALEZ–PENA, Petitioner,**

**v.**

**Victor HERBERT, Superintendent, Attica Correctional Facility, and Frank J. Clark, District Attorney, Erie County, Respondents.**

**No. 01–CV–6222.**

United States District Court,
W.D. New York.

Jan. 5, 2005.

Freddy Gonzalez–Pena, Stormville, NY, pro se.

Raymond C. Herman, Erie County District Attorney's Office, J. Michael Marion, Asst. District Attorney, Kevin M. Dillon, Erie County District Attorney, Buffalo, NY, for Defendants.

## DECISION AND ORDER

BIANCHINI, United States Magistrate Judge.

## INTRODUCTION

Freddy Gonzalez–Peña ("Gonzalez–Peña" or "petitioner") filed this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Erie County Court on two counts of criminal possession of a controlled substance, one count of forgery and one count of criminal impersonation. The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(b).

## BACKGROUND

Gonzalez–Peña was arrested on September 27, 1997, in the City of Buffalo for possessing heroin with the intent to sell. During the booking process, Gonzalez–Peña made false statements about his identity and alienage. Although he initially only was charged with criminal possession of a controlled substance, charges of forgery and criminal impersonation were added to the indictment following further investigation into his misrepresentations about his identity and citizenship.

Gonzalez–Peña's jury trial commenced in Erie County Court (D'Amico, J.) on March 30, 1998. A summary of the relevant trial testimony follows.

At about 6:30 p.m. on September 27, 1997, Detectives Lawrence Sadlocha ("Sadlocha"), Patrick Judge ("Judge") and Darnyl Parker ("Parker") from the Buffalo Police Department's Narcotics Squad were on duty operating an unmarked patrol car. One of their targets was the house at 382 Fargo Avenue about which they had received numerous citizen complaints of drug-related activity. That evening, the detectives observed two men walk down the driveway of 382 Fargo Avenue carrying plastic bags. Their suspicions raised about possible drug activity, the officers pulled their vehicle over, exited, and asked the two men to stop. One man waited in the driveway, but the other, Gonzalez–Peña, strode away quickly and then broke into a run. He was carrying a white plastic shopping bag with red markings on it under his arm.[1] The individual in the driveway told the detectives that he lived in the upper apartment at 382 Fargo Avenue, that the lower apartment was vacant, and that he did not know Gonzalez–Peña.

When Parker and Sadlocha pursued Gonzalez–Peña into the lower apartment, they observed a light go on in the rear of the house; the light turned out to be located in the stairwell leading to the basement. Sadlocha and Parker made their way to the back of the house. There, Sadlocha discovered a small white plastic bag with red markings sitting on a ledge in the stairwell. Inside the bag, which appeared identical to the one Gonzalez–Peña had been carrying, was a large amount of heroin packaged in individual glassine bags for sale.

Sadlocha and Parker then proceeded downstairs to the basement. Parker discovered Gonzalez–Peña about a minute or

---

1. There were some inconsistencies in the officers' testimony concerning whether Gonzalez–Peña had the bag in his possession prior to entering the house: Sadlocha and Judge both observed petitioner holding the white bag while outside in the driveway, but Parker testified that he did not recall petitioner having anything in his hands.

two later hiding behind a partition and placed him under arrest. The detectives testified that only a couple of minutes elapsed from the time Gonzalez–Peña ran into the house until Sadlocha found the heroin. Parker also found $700 in cash in Gonzalez–Peña's pockets, and this money was confiscated as drug sale proceeds.

During the booking procedure, Gonzalez–Peña claimed that his name was "Pedro Jose Serrano–Martinez." He produced three forms of identification with Serrano–Martinez's name: a Getty Gasoline Company employee card ("the Getty card"), a "New York State Residence Card" ("the residence card"), and a birth certificate.[2]

On the night of Gonzalez–Peña's arrest, Sadlocha asked Agent Daniel Allman ("Allman") of the United States Border Patrol to interview Gonzalez–Peña about his citizenship. During the interview, Allman asked Gonzalez–Peña his name, his Social Security number, where he was born, and the names of his parents. Gonzalez–Peña claimed to have been born on October 21, 1975, in Puerto Rico. When Allman asked Gonzalez–Peña for contact information for his parents in Puerto Rico, petitioner stated that he did not know where his parents lived.

After Gonzalez–Peña was finger-printed, he signed the fingerprint card as Pedro Serrano–Martinez.[3] Petitioner's fingerprints were found to match those of an individual named Daniel Peña, a/k/a Freddy Gonzalez–Peña, who had been deported to the Dominican Republic in 1995. The prosecution, over defense counsel objection, introduced two letters written by Daniel Peña, a/k/a Freddy Gonzalez–Peña, to the United States Immigration and Naturalization Service ("INS") in 1993 and 1994, while he was being detained at a state correctional facility pending resolution of a deportation issue.[4]

Doris Rivera, the occupant of the upstairs apartment at 382 Fargo Avenue, testified for the defense that Gonzalez–Peña was a friend of hers. He and a man named Elvis Santos ("Santos") had been visiting her for a few hours on the evening of September 27, 1997. When the two

2. On the evening of September 26, 1997, while on surveillance duty, Sadlocha and another narcotics officer had stopped Gonzalez–Peña outside of 382 Fargo Avenue after observing some suspicious activity around the house. As proof of identification, Gonzalez–Peña had shown Sadlocha the Getty card and the residence card. Sadlocha testified that the cards appeared to be of questionable validity because, first of all, there is no such thing as a "New York State Residence Card." Secondly, the photographs on both cards were identical. However, Sadlocha did not pursue the matter further that evening and released Gonzalez–Peña.

3. Further investigation revealed that Pedro Serrano–Martinez, date of birth October 21, 1975, in fact existed and had been arrested in Puerto Rico on murder and firearms charges.

4. In the letter dated October 12, 1993, Gonzalez–Peña stated that he was "incarcerated at Marcy Correctional Facility" and wanted to know how he could "go about removing the INS warrant" for his deportation. He stated, "Please be aware I am not a legal resident in the USA." He further stated that he was "ready to sign [his] deportation as soon as possible." He signed the letter "Daniel Peña, a/k/a Freddy Gonzalez–Peña." Trial Transcript ("Tr.") at 25–26. In a letter received by the INS on May 16, 1994, Gonzalez–Peña indicated that he remained incarcerated at the same facility and explained that "[t]hrough self-negligence [he] became entwined in this system" and was a "mere cog on the wheel of injustice." He referenced a February 7, 1994 letter in which he requested the removal of the INS warrant on him. He further stated that he had sent the INS his birth certificate from Puerto Rico in order to prove his United States citizenship. The May 16 letter was signed "Daniel Peña" without any reference to "a/k/a Freddy Gonzalez–Peña." Id. at 26–27.

men left between 6 p.m. and 7 p.m., Santos was carrying a white "shoe bag" and a duffel bag, both of which contained clothing. Gonzalez–Peña did not have anything in his hands when he left her apartment. Several moments later, she looked out the window and observed Santos being questioned by the police, but she did not see Gonzalez–Peña.

Omayra Rivera, Doris Rivera's sister, testified that on the evening of September 27, 1997, she observed Santos place shoes and clothing into a white "shoe bag" while he was at the apartment. The next time she observed Santos was when the policemen were searching Santos' bag in. the driveway. Like her sister, Omayra Rivera did not see where Gonzalez–Peña went after he left the apartment. Both Doris and Omayra Rivera testified that they had never observed Gonzalez–Peña in the basement of 382 Fargo Avenue.

The jury returned a verdict of guilty on all charges on April 3, 1998. Gonzalez–Peña was sentenced on May 29, 1998, as a second felony offender to concurrent indeterminate terms of imprisonment of 12½ to 25 years and 7½ to 15 years for the third degree and fourth degree controlled substance possession charges, respectively. He was sentenced to 2 to 4 years on the forgery charge and a definite term of 1 year for the criminal impersonation charge, both terms to be served concurrently with each other, but consecutively to the sentences for the possession counts.

Gonzalez–Peña appealed his conviction which was unanimously affirmed by the Appellate Division, Fourth Department, of New York State Supreme Court on September 29, 2000. *People v. Gonzalez Peña,* 275 A.D.2d 1007, 713 N.Y.S.2d 588 (4th Dept.2000). The Court of Appeals denied leave to appeal on December 14, 2000. *People v. Gonzalez–Peña,* 95 N.Y.2d 967, 722 N.Y.S.2d 485, 745 N.E.2d 405 (2000).

On April 27, 2001, petitioner filed a petition for a writ of habeas corpus in this Court pursuant to 28 U.S.C. § 2254 alleging the following grounds for relief: (1) counsel failed to move to suppress the heroin seized at Fargo Avenue; (2) counsel erred in not objecting to the border patrol agent's testimony concerning his pedigree questioning of petitioner; (3) counsel did not request limiting instructions concerning evidence received as to petitioner's previous deportation and illegal re-entry; (4) counsel failed to object to improper remarks by the prosecutor; (5) the chemist's testimony was inadmissible hearsay; (6) the trial court erred in allowing the prosecution to use evidence regarding petitioner's deportation in its direct case on the forgery and criminal impersonation charges; and (7) a proper chain of custody was never established for the seized drugs.

Respondent answered the petition on August 3, 2001, and submitted a memorandum of law in support of its request for an order dismissing the petition. *See* Docket ## 6, 7. At that time, Gonzalez–Peña had pending a motion for a reconstruction hearing pursuant to *People v. Antommarchi,* 80 N.Y.2d 247, 590 N.Y.S.2d 33, 604 N.E.2d 95 (1992), on the ground that one of his arresting officers, Darnyl Parker, had planted the drugs seized at Fargo Avenue. Gonzalez–Peña stated that Parker "was a direct part of the alleged drug arrest" forming the basis of the conviction challenged in this habeas petition, and he requested that the petition be held in abeyance so that he could return to state court and file a motion to vacate the judgment based on the prosecution's alleged failure to disclose material impeachment evidence about Parker in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (*"Brady"*). *See* Docket # 9. Respondent opposed Gonzalez–Peña's motion. *See* Docket # 11.

After receiving a copy of Gonzalez–Peña's motion pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 and the Erie County Court order denying that motion,[5] this Court issued an order granting his motion to amend his habeas petition to add the *Brady* claim. *See* Docket # 15. Gonzalez–Peña was directed to file a supplemental petition setting forth the substance of his *Brady* claim and addressing whether the claim had been properly exhausted in state court. In light of the Court's ruling, Gonzalez–Peña's motion to hold his petition in abeyance was denied as moot.

On October 22, 2002, Gonzalez–Peña requested an extension of time to supplement his petition. However, the Court's order granting this request crossed in the mail with his supplemental pleading mailed October 31, 2002. Thus, the Court received Gonzalez–Peña's "Supplemental Pleading" amending his original habeas petition to add the claimed *Brady* violation on November 6, 2002. By order entered November 8, 2002, this Court permitted petitioner until December 30, 2002, to file his supplemental pleading.

After receiving another request from Gonzalez–Peña for additional time to respond due to the fact that his legal materials did not follow him when he was transferred to a new correctional facility, the Court granted him until January 30, 2003, to file his supplemental pleading. Unfortunately, Gonzalez–Peña no longer had access to the law assistant helping him with his *Brady* claim once he was transferred to the new facility. In a further inauspicious turn of events, the new law assistant to whom he entrusted his case forwarded to the Court a wholly unintelligible set of papers. These were returned to petitioner on May 2, 2003. *See* Docket # 25. In light of these circumstances, the Court granted petitioner until August 8, 2003, to file a supplemental petition with his *Brady* claim.

On July 7, 2003, Gonzalez–Peña forward to this Court an amended memorandum of law setting forth his *Brady* claim and a number of exhibits. *See* Docket # 29, with Exhibits 1—13. Respondent filed a memorandum of law in opposition to the supplemental petition on January 12, 2004. *See* Docket # 30.[6] Respondent does not raise the affirmative defense of exhaustion as to any of Gonzalez–Peña's claims, and the Court finds that they have been fully exhausted and are properly presented on habeas review.

For the reasons set forth below, Gonzalez–Peña's habeas petition is denied.

## DISCUSSION

### I. Standard of Review

Because the filing of this petition postdates the enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), AEDPA's revisions of 28 U.S.C. § 2254 govern this proceeding. *See Williams v. Taylor,* 529 U.S. 362, 402,

---

**5.** Judge D'Amico denied Gonzalez–Peña's *Brady* claim in a written decision and order entered August 20, 2002. The Appellate Division, Fourth Department, denied leave to appeal on February 24, 2003.

**6.** Gonzalez–Peña filed a motion on January 26, 2004 (*see* Docket # 31), requesting that his petition be stayed to give him an opportunity to supplement his amended habeas petition to include the claims in his original habeas petition. However, the Court is not treating Gonzalez–Peña's amended habeas petition as a second petition. The Court specifically directed him to only include the *Brady* claim in his amended petition, and indicated that the claims in his original habeas petition would not be abandoned. The Court has addressed all of Gonzalez–Peña's claims in this present opinion, and therefore there is no need for petitioner to file another petition.

120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). When Congress enacted AEDPA, it "significantly curtailed the power of federal courts to grant the habeas petitions of state prisoners." *Lainfiesta v. Artuz*, 253 F.3d 151, 155 (2d Cir.2001) (citing *Williams*, 529 U.S. at 399, 120 S.Ct. 1495). A Federal court may not grant a habeas petition on a claim that was adjudicated on the merits in State court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1), (2).

A State court decision is "contrary to" established Federal law if the State court either "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams*, 529 U.S. at 405–06, 120 S.Ct. 1495. A State court decision is an "unreasonable application" of Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular case." *Id.* at 407–08, 120 S.Ct. 1495.

## II. Procedural Default

█ The Supreme Court has made clear that the adequate and independent State ground doctrine applies on Federal habeas review, such that "an adequate and independent finding of procedural default" will bar Federal habeas review of the Federal claim, unless the petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that the court's refusal to consider the Federal claim will result in a fundamental miscarriage of justice. *Harris v. Reed*, 489 U.S. 255, 262,

109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (citations and internal quotations omitted).

### A. Erroneous admission of the chemist's testimony and failure to establish proper chain of custody

Respondent asserts that Gonzalez–Peña has procedurally defaulted his chain of custody and hearsay claim concerning the chemist's testimony, noting that defense counsel voiced no objections at trial to the introduction of the evidence in question.

Petitioner claims that the trial court improperly admitted hearsay testimony by Michael Krajewski ("Krajewski") concerning the laboratory analysis performed by James Sieracki ("Sieracki") of the heroin seized during Gonzalez–Peña's arrest. Because Sieracki was unavailable to testify at trial due to a family emergency, his supervisor, Krajewski, testified in his place. Gonzalez–Peña argues that Krajewski's testimony was unreliable because Sieracki's notes were never introduced into evidence. *See* Attachment to Habeas Petition at 13–15, Docket # 1.

Gonzalez–Peña also raises a chain of custody issue, arguing that the "drugs were properly [*sic*] authenticated since the People did not offer the drugs themselves into evidence but tattered remnants of what is alleged to have contained drugs, and the testimony of a chemist who was not the chemist that received, nor [*sic*] tested the drugs." *Id.*

With regard to the chemist's testimony, defense counsel initially moved to strike Krajewski's testimony on the ground that he had no personal knowledge of the testing procedures utilized by the chemist who performed the analysis. Tr. at 278. The court denied the motion. On cross-examination, defense counsel elicited testimony from Krajewski that Sieracki had performed numerous similar analyses in the past. Thereafter, defense counsel re-

newed his motion to strike Krajewski's testimony on the same grounds. Tr. at 287.

The prosecutor pointed out that, at an earlier conference in chambers, defense counsel had said that it was unnecessary to re-analyze the drugs and that he did not object to having the supervising chemist, Krajewski, testify from Sieracki's notes. Tr. at 287–88. Defense counsel did not dispute this representation. In response, he stated,

> Had the prosecution brought to the Court qualifications of Mr. Sieracki to give expert opinion testimony as to this type of chemical analysis, I wouldn't have objected ... Because the prosecution failed to bring in any type of qualification, I have to object to his entire testimony. That's my reason.

Tr. at 288–89. The trial court told defense counsel,

> With respect to this business about qualifying the chemist who didn't testify ..., if you objected to the testimony at the time you felt that he wasn't qualified, I may have sustained it because I didn't hear anything about his qualifications until you elicited them[.]

Tr. at 289–90.

On direct appeal, the Fourth Department held that the issues were not preserved for review, *see People v. Gonzalez–Peña,* 275 A.D.2d at 1007, 713 N.Y.S.2d 588 (citing N.Y.Crim. Proc. Law § 470.05(2)), and declined to review them in the interest of justice, *id.*

■ Pursuant to New York's "contemporaneous objection" rule, in order to preserve a challenge to an item of evidence, defense counsel is required to object at trial. *See* N.Y.Crim. Proc. Law § 470.05(2). The Second Circuit and the Supreme Court have held that the failure to object at trial when required by New York's "contemporaneous objection" rule is an adequate and independent state ground. *See, e.g., Garcia v. Lewis,* 188 F.3d 71, 79 (2d Cir.1999); *Wainwright v. Sykes,* 433 U.S. 72, 86, 90, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

■ Because there is an adequate and independent State law-based finding by the Fourth Department that Gonzalez–Peña procedurally defaulted on his hearsay and chain of custody claims, he would have to show in his habeas petition cause for the default and prejudice attributable thereto. *Harris v. Reed,* 489 U.S. at 262, 109 S.Ct. 1038. Gonzalez–Peña has not alleged cause for, or prejudice resulting from, the default, nor do I see any basis in the record for such an argument. Thus, Gonzalez–Peña may only avoid the consequences of his procedural default if he can show that the failure to address these claims will result in a fundamental miscarriage of justice, *i.e.,* that he is actually innocent. *Coleman v. Thompson,* 501 U.S. 722, 748, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).[7] Gonzalez–Peña does not make an actual innocence argument, and I do not find such an assertion supportable on the record before me. Accordingly, these two claims are barred from habeas review. In

---

7. The Supreme Court has explained that the fundamental miscarriage of justice exception is "extremely rare" and should be applied only in "the extraordinary cases." *Schlup v. Delo,* 513 U.S. 298, 321–22, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). " '[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). "To establish actual innocence, a petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Id.* (quoting *Schlup,* 513 U.S. 298, 327–28, 115 S.Ct. 851, 130 L.Ed.2d 808) (some internal quotation and citation marks omitted).

the interest of judicial economy and completeness, however, I will review the claims since there are readily disposed of on the merits.

■ Federal habeas corpus relief will not issue to rectify errors of State constitutional, statutory, or procedural law unless a Federal constitutional issue is also presented. *See Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (A Federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States;" it is not the province of a Federal habeas court to reexamine state court determinations of State law.). "The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir.1998), *cert. denied*, 525 U.S. 840, 119 S.Ct. 101, 142 L.Ed.2d 81 (1998) (quoting *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)). Thus, the habeas court must ask "whether the erroneously admitted evidence, viewed objectively in light of the entire record ... was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir.1985).

■ Typically, a defendant challenges the introduction of an absent witness's notes or records on the basis that it violates his right as a criminal accused to be confronted by the witnesses who testify against him. The Confrontation Clause of the Sixth Amendment is not necessarily violated by the prosecution's failure to produce a hearsay declarant for cross-examination at trial "where the 'utility of trial confrontation' would be 'remote' and of little value to either the jury or the defendant." *Reardon v. Manson*, 806 F.2d 39, 41 (2d Cir.1986) (reversing habeas relief that had been granted because the state's supervising toxicologist gave testimony in a narcotics case that was based on tests of other chemists, and the government had failed to show that those chemists were unavailable to testify) (quoting *Ohio v. Roberts*, 448 U.S. 56, 65 n. 7, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)); *see also Singh v. Greiner*, 2002 WL 31641608, at *4 (E.D.N.Y. Nov.18, 2002).

■ Here, in contrast, Gonzalez–Peña argues that Krajewski's testimony, which was based on Sieracki's notes, was rendered unreliable by the failure to introduce those notes into evidence. Even assuming that Gonzalez–Peña is correct in asserting that the trial court should have admitted these reports under the business records exception to the hearsay rule, this Court is limited on habeas review to considering whether the challenged ruling involved error of constitutional magnitude.

At the outset, I note that police officers routinely testify from investigative reports which typically are not admitted under New York State evidentiary law. Thus, the failure to introduce the officers' reports does not render their testimony unreliable. Here, although it would have been preferable to have Sieracki testify, Krajewski certainly was competent to testify in his stead.

As the supervising chemist, Krajewski was well qualified to interpret Sieracki's notes and could easily be cross-examined on general testing procedures and their accuracy and reliability. *See Reardon*, 806 F.2d at 41 ("Any testimony from the chemists bearing on the likelihood of error in the tests necessarily would have involved broad statements as to general practices and probabilities within the laboratory,

matters concerning which [the supervising chemist] himself was well qualified to testify."). Krajewski answered all questions put to him by defense counsel about the general accuracy and reliability of the equipment and testing procedures and the integrity of the heroin standard used for comparison. *See* Tr. at 280–85. Based upon my review of the record, I conclude that the admission of Krajewski's testimony based on the absent chemist's notes did not deprive Gonzalez–Peña of a fundamentally fair trial.

As to the chain of custody issue, Gonzalez–Peña claims that there is a discrepancy in the officers' testimony as to when the drugs were removed from the evidence locker for testing: Judge claimed to have put the heroin in the locker on September 27, 1997, but Sadlocha testified that the drugs were in the laboratory's custody as of September 27, 1997. Krajewski testified that the heroin was received at the laboratory on September 29, 1997. Gonzalez–Peña points out that Sieracki did not test the evidence until September 30, 1997, one day after it was received at the laboratory, and that Krajewski personally did not see whether the evidence was sealed when it arrived. According to Gonzalez–Peña, the prosecution thus did not establish that the tested substance was identical to the material seized at 382 Fargo Avenue.

▇ Gonzalez–Peña's chain of custody argument presents a question of State evidentiary law that generally is not amenable to habeas review. *See Estelle v. McGuire*, 502 U.S. at 67–68, 112 S.Ct. 475. Under New York law, "failure to establish a chain of custody may be excused 'where the circumstances provide reasonable assurances of the identity and unchanged condition' of the evidence." *People v. Julian*, 41 N.Y.2d 340, 392 N.Y.S.2d 610, 360 N.E.2d 1310 (1977) (quoting *Amaro v. City*

*of New York*, 40 N.Y.2d 30, 386 N.Y.S.2d 19, 351 N.E.2d 665 (1976)). Furthermore, both Federal and State law clearly hold that a defect in the chain of custody goes to the weight of the evidence, not its admissibility. *Cassell v. Ricks*, 2000 WL 1010977, at *7 (S.D.N.Y. July 21, 2000) (citing, *e.g., United States v. Hon*, 904 F.2d 803, 810 (2d Cir.1990) ("Once the exhibits were admitted into evidence, the alleged defects in the government's chain of custody proof were for the jury to evaluate in its consideration of the weight to be given to the evidence.")).

▇ Even if petitioner's claim were cognizable on habeas review, it is without merit. The issue of whether the packets introduced at trial and analyzed as heroin were the packets seized at 382 Fargo Avenue was for the jury to decide based upon all the evidence before it. *See, e.g., Howard v. Keane*, 1991 WL 352488, at *2 (E.D.N.Y. Dec.9, 1991) (finding chain of custody issue not cognizable on habeas review and without merit; whether the packets introduced at petitioner's trial and analyzed as cocaine were the packets seized was a jury question).

The Court finds that a reasonable jury could have concluded that the prosecution established a complete chain of custody and that the drugs introduced at trial were the heroin packets discovered in the white shopping bag which Gonzalez–Peña was seen holding at 382 Fargo Avenue. Furthermore, to the extent that Gonzalez–Peña implicitly challenges the chemist's and the officers' testimony, this Court cannot disturb the jury's decision to credit Krajewski's testimony that the evidence received by the laboratory was as described in the submission record and that, according to the analyzing chemist's notes, he had continuous possession of the drugs and initialed the sealed bags upon opening them, *see* Tr. at 269, 277. *United States v.*

*Strauss*, 999 F.2d 692, 696 (2d Cir.1993) (The "jury is exclusively responsible for determining a witness' credibility."). Therefore, this claim provides no basis for habeas relief.

### B. Failure to Disclose Material Evidence—*Brady* Claim

Gonzalez–Peña claims that in February 2000, he became aware that Darnyl Parker, one of his arresting officers, had been indicted on Federal drug conspiracy charges. Parker was found guilty in April 2002, after a jury trial in the Western District of New York. Gonzalez–Peña now claims that the People violated their disclosure obligations pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, *supra*, by failing to provide him with information about Parker's police misconduct. According to Gonzalez–Peña, this information could have been utilized to impeach Parker at trial. *See* Petitioner's Amended Memorandum of Law at 6–7 (Docket # 29).

In denying petitioner's C.P.L. § 440.10 motion, the trial court noted that the allegations relating to Parker's criminal activities through 1993 were "supported only by newspaper articles." August 20, 2002 County Court Order at 3 (Docket # 14). Even though the articles appeared to be based upon testimony given in Federal court, the trial court found that it was required to deny Gonzalez–Peña's motion because he "failed to substantiate essential facts of his motion by an independent affidavit or other evidence." *Id.* (citing N.Y.Crim. Proc. Law § 440.30(4)(b) and *Romero v. United States*, 28 F.3d 267, 269 (2d Cir.1994) (newspaper articles detailing improper conduct on part of arresting officers were not "newly discovered evidence" warranting new trial)).

Respondent raises procedural default as a defense to petitioner's *Brady* claim. *See* Respondent's Supplemental Memorandum of Law at 5 (Docket # 30). The Court notes that there is a split of authority within the Second Circuit as to whether denial of a motion pursuant to N.Y.Crim. Proc. Law § 440.30(4) is an "independent and adequate" state procedural bar. *See Skinner v. Duncan*, 2003 WL 21386032, at *27–28 (S.D.N.Y. June 17, 2003) (citing, *e.g.*, *Shaw v. Artuz*, 2001 WL 1301735, at *3–4 (S.D.N.Y. Oct.19, 2001) (Petitioner procedurally defaulted his claim by failing to comply with N.Y.Crim. Proc. Law § 440.30(4)(b), "which requires appellants to support their allegations with sworn statements. By failing to conform with this state procedural rule, [petitioner] defaulted this claim."); *White v. Keane*, 2001 WL 699053, at *2 (S.D.N.Y. June 21, 2001) ("a violation of [N.Y.Crim. Proc. Law § 440.30(4)(b) ] would create a procedural bar"); *Roberts v. Scully*, 875 F.Supp. 182, 192–93 n. 9 (S.D.N.Y.1995) (denial under N.Y.Crim. Proc. Law § 440.30(4)(b) due to inadequacy of petitioner's papers would be an independent and adequate state law ground)).

Other decisions, however, disagree and find that denial pursuant to N.Y.Crim. Proc. Law § 440.30(4)(b) is a decision on the merits. *E.g.*, *Lou v. Mantello*, 2001 WL 1152817, at *9 n. 9 (E.D.N.Y. Sept.25, 2001) (claims rejected pursuant to N.Y.Crim. Proc. Law §§ 440.30(4)(b) and 440.30(4)(d) were not procedurally barred; state's argument that the § 440 court's denial was based on an adequate and independent state ground was "based on an erroneous interpretation of [these sections], which in fact provide that a trial court may deny a motion to vacate a judgment of conviction only 'upon considering the merits.'") (collecting cases); *Ortiz v. Keohane*, 1995 WL 669904, at *4 n. 5 (E.D.N.Y. Nov.5, 1995) (same); *Muhammad v. Kirk*, 1993 WL 37502, at *4 & n. 5

(S.D.N.Y. Feb.8, 1993); *see also Smart v. Scully,* 787 F.2d 816, 820 (2d Cir.1986) (state court's denial of *pro se* defendant's motion to vacate for failure to comply with N.Y.Crim. Proc. Law § 440.30 by omitting sworn allegations was not "'an adequate and independent state ground' warranting a federal habeas court to refuse to consider the underlying federal issues").

The Court agrees with the district courts' reasoning in *Lou v. Mantello* and *Skinner v. Duncan, supra.* Because Section 440.30 refers to the procedures for deciding Section § 440.10 motions, and Section 440.30(4) specifically states that "[u]pon considering the merits of the motion, the court may deny it without conducting a hearing" if certain conditions exist, that is a merits-based decision, not a procedural bar. Indeed, as the district court in *Skinner* pointed out, "the fact that C.P.L. § 440.30(3) requires, a court to grant a C.P.L. § 440 motion without a hearing if certain requirements are met strongly suggests that C.P.L. § 440.30(4)'s provisions are not procedural." *Skinner v. Duncan,* 2003 WL 21386032, at *28. The Court therefore will address the merits of Gonzalez–Peña's claim.[8]

■■■ To the extent that the prosecution knows of material evidence favorable to a criminal defendant, it has a due process obligation to disclose that evidence. *See, e.g., Kyles v. Whitley,* 514 U.S. 419, 431, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Brady,* 373 U.S. at 87, 83 S.Ct. 1194 (holding that suppression by the prosecution of evidence favorable to the accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"). *Brady* matter includes not only exculpatory evidence going to the heart of the defendant's guilt or innocence, but also impeachment evidence having the potential to undermine the credibility of a significant prosecution witness. *See, e.g., Giglio v. United States,* 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (A "jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence.").

■■■ The prosecution is deemed to have constructive knowledge of "evidence 'known only to police investigators and not to the prosecutor.'" *Strickler v. Greene,* 527 U.S. 263, 280–81, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (quoting *Kyles v. Whitley,* 514 U.S. at 437, 115 S.Ct. 1555). *Brady* imposes upon each individual prosecutor a "duty to learn of any favorable evidence known to the others acting on the government's behalf in [the defendant's] case, including the police.'" *Id.* (quoting *Kyles,* 514 U.S. at 437, 115 S.Ct. 1555). However, "knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor" for *Brady* purposes. *United States v. Avellino,* 136 F.3d 249, 255 (2d Cir.1998). As the Second Circuit has noted, adoption of such a "monolithic view of government" would condemn criminal prosecution "to a state of paralysis." *Id.; see also United States v. Quinn,* 445

---

**8.** Despite its finding of a procedural bar, the trial court went on to consider the merits of Gonzalez–Peña's *Brady* claim. The Second Circuit has held that "[t]he principle barring habeas review of procedurally forfeited claims is 'relaxed when the state courts themselves have disregarded the default and decided the constitutional claim on the merits.'" *Reyes v. Keane,* 118 F.3d 136, 138 (2d Cir.1997) (quoting *Roman v. Abrams,* 822 F.2d 214, 222 (2d Cir.1987)). That is what occurred in the present case, strengthening this Court's conclusion that its review of the *Brady* claim on the merits is appropriate.

F.2d 940, 944 (2d Cir.1971) (finding "completely untenable" the position that "knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor") (internal quotations omitted). In situations analogous to the present case, the Second Circuit has not required Federal prosecutors to learn of evidence possessed by State governments or other Federal agencies that are not involved in the investigation of the particular defendants. *E.g., Avellino,* 136 F.3d at 256 (refusing to charge Federal prosecutor with constructive knowledge of information gathered in a state investigation); *United States v. Locascio,* 6 F.3d 924, 949 (2d Cir.1993) (FBI agents uninvolved in the prosecution of the individual defendants, so no duty to learn of evidence regarding them; court refused to "infer the prosecutors' knowledge simply because some other government agents knew about" the evidence.).

 Gonzalez–Peña argues that it has been "established" that the prosecution was aware of prior misconduct by Parker. The only support for this claim is a newspaper article discussing Parker's trial in Federal court, in which an FBI agent testified that the FBI knew of two sources who, in 1993, reported that Parker was a "dirty cop" based on his communication of certain inside information to drug dealers. *See* Newspaper article titled "Ex-con says Parker offered loan, told him to stop selling drugs," attached as Exhibit 1 to Docket # 29. The article goes on to state that Parker was "exonerated" by the Buffalo Police Department after a hearing because the FBI declined to disclose its confidential informants. However, Parker was removed from a Federal task force. *See id.* The article suggests that the Buffalo Police Department itself investigated Parker in 1993 on suspicions of corruption and thus had actual knowledge of his alleged criminal activities.

 In considering the merits of the *Brady* claim on the motion to vacate pursuant to C.P.L. § 440.10, the trial court found that since the police department's internal investigation was unrelated to the information gathered by the police for Gonzalez–Peña's prosecution, knowledge of the departmental investigation should not be imputed to the prosecutor; "[t]o hold otherwise would essentially require the prosecutor to comb through the personnel file of each police witness to determine the existence of any possible impeachment material, a duty that the courts of this State have declined to impose." County Court Order at 3 (Docket # 14) (citing *People v. Shakur,* 169 Misc.2d 961, 967, 648 N.Y.S.2d 200 (N.Y.Sup.Ct.1996) ("A prosecutor is not constructively aware of police files *unrelated* to the case on trial unless there exists some reason to believe a file contains relevant information"; *Brady* does not require prosecutor, in response to defendant's boilerplate request for discovery of prior disciplinary actions involving officers participating in investigation of case, to review confidential personnel files of all officers who participated in investigation) (emphasis in original)). Gonzalez–Peña has not argued that the prosecutor had actual knowledge of any of Parker's misdeeds.

Gonzalez–Peña has offered no support for the proposition that, under the circumstances presented here, he was entitled to have the prosecutor inspect the Buffalo Police Department personnel files of its testifying detectives-witnesses to ascertain whether the files contained *Brady* information. I note that the 1993 inquiry into Parker's misconduct was not related to the investigation of Gonzalez–Peña, it having been undertaken some four years prior to petitioner's arrest. In *United States v.*

*Escobar,* 842 F.Supp. 1519 (E.D.N.Y.1994), the district court noted that notwithstanding *United States v. Henthorn,*[9] "the rule in [the Second] Circuit is that while other federal agencies may have files containing impeachment materials which the prosecutor would be required to produce if they were in his or her own files, the prosecutor is not responsible. for knowing what is in the files of other agencies." *Id.* at 1530 ("defendant has made no showing, indeed, he does not even allege that any of the personnel files of the testifying agent-witnesses contain impeachment material") (citing *United States v. Stofsky,* 527 F.2d 237, 244 n. 7 (2d Cir.1975) (prosecutor did not act unreasonably in failing to delve more deeply into a witness's financial affairs, where such inquiry would have revealed impeachment material in the form of falsehoods regarding tax returns), *cert. denied sub nom. Hoff v. United States,* 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976)); *see also Morgan v. Salamack,* 735 F.2d 354, 358 (2d Cir.1984) ("A prosecutor is not constitutionally obligated to obtain information *dehors* his files for the purpose of discovering information which defense counsel can use in impeaching the credibility of a prosecution witness.").

The district court in *United States v. Preston* observed that "[a] duty to search files maintained by governmental agencies closely aligned with the prosecution may be triggered when there is some reasonable prospect or notice of finding exculpatory evidence." 1996 WL 254379, at *15 (citing *United States v. Brooks,* 966 F.2d 1500, 1503 (D.C.Cir.1992)). Here, however, Gonzalez–Peña did not allege in his omnibus discovery motion that any of the officers' personnel files might contain impeachment materials.[10]

Moreover, I find, as did the trial court, that there is no "reasonable probability" that disclosure of the departmental mis-

**9.** 931 F.2d 29 (9th Cir.1991), *cert. denied,* 503 U.S. 972, 112 S.Ct. 1588, 118 L.Ed.2d 306 (1992). Although the Ninth Circuit held in *Henthorn* that the prosecution's obligation to examine the files of its agents-witnesses arises by virtue of the making of a demand for their production, other courts, including the Eastern District of New York in *Escobar,* have declined to so hold. *See United States v. Preston,* 1996 WL 254379, at *14 (D.Kan. Apr.5, 1996) (denying defendant's motion requesting the government to produce personnel files of the officers involved in his criminal investigation) (citing, *e.g., United States v. Lafayette,* 983 F.2d 1102 (D.C.Cir.1993); *United States v. Driscoll,* 970 F.2d 1472 (6th Cir.1992)) (where defendant offered no support for his contention that personnel files might contain information important to his case, the court of appeals affirmed the district court's denial of defendant's discovery request); *United States v. Andrus,* 775 F.2d 825, 843 (7th Cir.1985) (Defendant "was not entitled to the personnel files of the law enforcement witnesses without even a hint that impeaching material was contained therein."); *State v. Robles,* 182 Ariz. 268, 895 P.2d 1031 (1995), *review denied,* 184 Ariz. 267, 908 P.2d 483 (1995) (specifically declining to adopt *Henthorn;* adopting the threshold materiality standard required in *United States v. Driscoll,* 970 F.2d 1472 (6th Cir.1992), *cert. denied,* 506 U.S. 1083, 113 S.Ct. 1056, 122 L.Ed.2d 362 (1993)).

**10.** Simply because the officers' personnel records are confidential pursuant to New York Civil Rights Law § 50–a does not mean that they necessarily would be precluded from disclosure if they, in fact, did contain *Brady* material. Section 50–a provides that if a defendant makes a *prima facie* showing that personnel files contain information warranting disclosure, an *in camera* hearing may be held so that the court may review the records. *See Shakur,* 169 Misc.2d 961, 967, 648 N.Y.S.2d 200 (citing N.Y. Civ. Rts. Law § 50–a(2) and *People v. Gissendanner,* 48 N.Y.2d 543, 550, 423 N.Y.S.2d 893, 399 N.E.2d 924 (1979)). In that way, a balance is struck between the defendant's interest in confronting adverse witnesses against him and the state's interest in maintaining the confidentiality of the internal performance and disciplinary records of police officers.

conduct charges against Parker would have led to a different result at trial. *See United States v. Coppa,* 267 F.3d 132, 141 (2d Cir.2001) (citing *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) ("A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome" of petitioner's criminal proceedings.)). Gonalez–Peña argues that the drugs at issue in his case could have been seized during Detective Parker's prior arrest and then planted on petitioner. *See* Petitioner's Amended Memorandum of Law at 7 (Docket # 29). Gonzalez–Peña offers nothing but mere speculation in support of this claim. First of all, I note that Parker was not arrested in 1993 but rather was released from further scrutiny by the Buffalo Police Department. Parker was not arraigned on federal conspiracy charges until March 2000, nearly three years after petitioner was arrested.

Significantly, the facts at trial showed that Parker's testimony was not crucial in linking the seized drugs to Gonzalez–Peña. Rather, only Detectives Sadlocha and Judge observed petitioner holding the white plastic shopping bag later found to contain heroin bundled for sale. Parker was only tangentially involved in discovering the heroin at 382 Fargo Avenue; it was Sadlocha who found the bag on a ledge in the basement stairwell.

Even though Parker discovered Gonzalez–Peña hiding in the basement, he was the only officer on the scene who did not observe petitioner in actual possession of the white plastic bag. For this reason, Parker's testimony in fact was helpful to the defense, and defense counsel attempted to use it to petitioner's advantage. At trial, defense counsel stressed that Parker's observations on the evening of September 27 were to be credited and that he was to be applauded for not changing his testimony in order to make it agree with that of his partners. Discrediting Parker would have undercut counsel's sound defense strategy of attempting to create doubt in the jurors' minds about the testimony offered by Sadlocha and Judge. Therefore, I cannot find a reasonable probability that evidence of Parker's prior alleged misconduct would have resulted in a favorable verdict. The trial court's denial of Gonzalez–Peña's *Brady* claim was neither contrary to, nor an unreasonable application of, governing Federal law.

### III. Merits of remaining claims

#### A. Ineffective assistance of counsel

Gonzalez–Peña faults the performance of his trial attorney, complaining that (1) counsel failed to move to suppress the heroin found by the police; (2) counsel did not move to preclude the statements given by petitioner to a border patrol agent; (3) counsel did not request a limiting instruction on the jury's consideration of petitioner's deportation and illegal re-entry into this country; and (4) counsel failed to object to remarks made during the prosecutor's summation. *See* Attachment to Habeas Petition at 1–8 (Docket # 1).

In order to obtain habeas corpus relief on the ground of ineffective assistance of counsel, Gonzalez–Peña must meet the rigorous standard set forth in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), by demonstrating that counsel's performance was deficient and that this deficiency prejudiced his defense. The Supreme Court explained in *Strickland* that this first requires a "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment." *Id.* Next, petitioner must show that counsel's professionally unreasonable performance effectively

"deprive[d] [him] of a fair trial, a trial whose result is reliable." *Id.*

### 1. Failure to bring suppression motion

 Respondent argues that Gonzalez–Peña has not established that counsel was unreasonable in declining to make a suppression motion, pointing out that counsel could not move to suppress the seized drugs unless petitioner could assert a privacy interest in the drugs or the location from which they were seized. *See* Respondent's Memorandum of Law at 9 (Docket # 7). However, there is no proof in the record that petitioner had a colorable privacy interest in the house where the drugs were seized. At trial, the occupant of the upper apartment at Fargo Avenue testified that the lower apartment was vacant and that she had never seen Gonzalez–Peña in the basement of the lower apartment. Furthermore, petitioner has not indicated that he would have admitted to possessing the drugs. In fact, at trial, defense counsel argued that the People lacked any evidence that Gonzalez–Peña actually possessed the seized heroin.

The Fourth Department held that since Gonzalez–Peña never asserted a possessory interest in the heroin, he "thus lacked standing to bring the motion" to suppress. *People v. Gonzalez–Peña*, 275 A.D.2d at 1007, 713 N.Y.S.2d 588 (citing, *e.g.*, *People v. Brown*, 256 A.D.2d 42, 682 N.Y.S.2d 32 (1st Dept.1998)). If a suppression motion likely would not have succeeded, defense counsel's failure to make the motion does not constitute ineffective assistance because no prejudice inures to the petitioner in such a case. *Cf.*, *e.g.*, *Erdheim v. Grein-*

er, 22 F.Supp.2d 291, 295 (S.D.N.Y.1998) ("Since petitioner has not proved that he had a meritorious speedy trial claim, there is no reasonable probability that his counsel's failure to raise the motion affected the outcome of the case.").

### 2. Failure to move to preclude testimony by border patrol agent

 Gonalez–Peña argues that counsel neglected to raise any objections to the testimony of border patrol agent Allman concerning statements made by petitioner despite the fact that the prosecution never provided notice pursuant to C.P.L. § 710.30 with regard to these statements. Attachment to Petition at 4 (Docket # 1). Gonzalez–Peña states that because Allman questioned him concerning his "identity, citizenship, and family history in order to determine whether [he] was an illegal alien," the interrogation was "investigatory rather than simply routinely administrative" and should have been noticed pursuant to C.P.L. § 710.30.[11] *Id.*

In *Pennsylvania v. Muniz*, 496 U.S. 582, 600–02, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), Justice Brennan, writing for a plurality of the Supreme Court, reasoned that routine booking or "pedigree" questions are reasonably related to police record-keeping concerns and therefore fall outside *Miranda* protections and need not be suppressed. *See id.* at 601–02, 110 S.Ct. 2638. The plurality cautioned, however, that police may not ask questions designed to elicit incriminatory admissions at the booking stage without giving *Miranda* warnings. *See id.* at 602 n. 14, 110 S.Ct. 2638; *see also United States v. Adegbite*, 846 F.2d 834, 840 (2d Cir.1988), *after remand*,

---

**11.** Section § 710.30 provides that whenever the People intend to offer at trial "evidence of a statement made by a defendant to a public servant, which statement if involuntarily made would render the evidence thereof sup- pressible upon motion[,]" they must provide notice to the defendant specifying the evidence intended to be offered. N.Y.Crim. Proc. Law § 710.30(1).

877 F.2d 174, 179 (2d Cir.1989), *cert. denied,* 493 U.S. 956, 110 S.Ct. 370, 107 L.Ed.2d 356 (1989); *United States ex rel. Hines v. LaVallee,* 521 F.2d 1109, 1112–13 (2d Cir.1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976). Thus, the prosecution may not rely on the pedigree exception if the questions, although facially appropriate, are likely to elicit incriminating admissions because of the circumstances of the particular case. *See, e.g., United States v. Minkowitz,* 889 F.Supp. 624, 627 (E.D.N.Y.1995) (citing *Thompson v. United States,* 821 F.Supp. 110, 120 (W.D.N.Y.1993) ("[T]he booking exception is not absolute.")); *Muniz,* 496 U.S. at 602 n. 14, 110 S.Ct. 2638.

In determining whether the challenged information "falls within the benign category of 'basic identifying data required for booking and arraignment,'" *United States v. Gotchis,* 803 F.2d 74, 79 (2d Cir.1986) (quoting *Hines,* 521 F.2d at 1113), the court should also consider whether the inquiry was "innocent of any investigative purpose[.]" *United States v. Carmona,* 873 F.2d 569, 573 (2d Cir.1989). Both the content and context of the inquiry inform the court's determination; the "'relationship of the question asked to the crime suspected is highly relevant.'" *Minkowitz,* 889 F.Supp. at 627–28 (quoting *United States v. Mata–Abundiz,* 717 F.2d 1277, 1280 (9th Cir.1983) (alien arrested on state firearms charges was improperly interrogated by INS agent about his alien status where element of crime charged was defendant's citizenship)). Here, border agent Allman testified at trial that he was brought in by the police specifically because they entertained suspicions about Gonzalez–Peña's actual citizenship. Thus, there can be little dispute that Allman's questioning was for investigative purposes. Moreover, Gonzalez–Peña already had been booked. I agree with Gonzalez–Peña that Allman's inquiries about his identity, citizenship, and family were not "reasonably related" to any administrative concerns of the police.

Turning to the content of the inquiry, the alienage questions asked by Allman were not likely to elicit information relevant to the state drug possession charges faced by Gonzalez–Peña. *Compare, e.g., United States v. Disla,* 805 F.2d 1340, 1347 (9th Cir.1986) (defendant in drug case was subjected to improper interrogation "where the question as to where [he] lived was related to an element (possession) of the crime that [the officer] had reason to suspect [defendant] committed."). It is true that the data elicited from Gonzalez–Peña about his identity and citizenship led Allman to investigate Gonzalez–Peña's background further and ultimately resulted in charges of forgery and criminal impersonation. However, as respondent points out, the information requested by Allman duplicated the pedigree information already provided by Gonzalez–Peña to the police during the booking process. The only additional information elicited from Gonzalez–Peña related to his parents and was not incriminatory. Counsel was not unreasonable in failing to seek to preclude this cumulative testimony which did not prejudice his client.

### 3. Failure to request limiting instructions and failure to object to prosecutor's summation

██ Since these two alleged examples of counsel's deficient performance are intertwined, the Court will consider them together. Gonzalez–Peña contends that defense counsel "neglected to request important limiting instructions relative to the jury's consideration of the *Molineux* [12]

**12.** *People v. Molineux,* 168 N.Y. 264, 61 N.E. 286 (1901).

evidence of petitioner's deportation and illegal re-entry into this country." Attachment to Petition at 5 (Docket # 1). Because counsel did not request that the evidence be used solely with respect to the forgery and criminal impersonation charges, Gonzalez–Peña claims that "the jury was free to utilize it improperly as evidence of petitioner's propensity to commit crimes." *Id.* at 6.

During summation, the prosecutor explained that the letters were offered to show the benefit inuring to Gonzalez–Peña as a result of his pretending to be Serrano–Martinez, an element of the criminal impersonation charge. Tr. at 382–83. Even assuming that it would have been better practice for counsel to follow up on his earlier objection to the evidence by requesting a limiting instruction, counsel's failure to do so did not unduly prejudice petitioner. Gonzalez–Peña has offered nothing more than speculation in support of his contention that the outcome of the trial would have been different had the jury been giving limiting instructions.

Petitioner argues that counsel's error was compounded when the prosecutor made certain comments during summation. He contends that the prosecutor overstepped his bounds and urged the jury to convict petitioner on the basis that he was "a bad person[,] an illegal alien who had been deported and was now present in this country again illegally." Attachment to Petition at 7 (Docket # 1). In support of this claim, Gonzalez–Peña points to the following comment by the assistant district attorney:

... Not only is the man an illegal alien in this country now, he was an illegal alien arrested six years ago, deported three years ago, illegally in the country again.

Now, if this defendant wants to have a contest of credibility with the three de-

tectives who testified before you who have 50 years experience on the Buffalo Police force, I'm ready to have you decide the issue just on that basis, but that probably wouldn't be fair to the defendant.

Tr. at 372.

To prevail upon a claim of prosecutorial misconduct, a petitioner must show that the prosecutor engaged in " 'egregious misconduct ... amount[ing] to a denial of constitutional due process.' " *Floyd v. Meachum,* 907 F.2d 347, 353 (2d Cir.1990) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 647–48, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). Even if a prosecutor's remarks are improper, "constitutional error occurs only when the prosecutorial remarks were so prejudicial that they rendered the trial in question fundamentally unfair." *Floyd,* 907 F.2d at 355. When considering whether the prosecutor's comments deprived the petitioner of a fair trial, it is necessary to "place th[e] remarks in context." *Darden v. Wainwright,* 477 U.S. 168, 179, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

The Court finds that the prosecutor crossed the line with respect to his references concerning Gonzalez–Peña's deportation and illegal re-entry into the United States. The Court cannot condemn strongly enough prosecutors who attempt to pass off such cheap shots as legal argument. Although the jury would have heard that petitioner had been deported, since the INS letters were introduced into evidence, the prosecutor's remark was calculated to prey upon the prejudices of the jurors and inflame them against Gonzalez–Peña. It clearly was improper.

The challenged comments regarding the "credibility contest" were made in the context of a larger discussion of credibility in which the prosecutor emphasized that peti-

tioner's veracity was suspect because he lied to the police about his identity and citizenship. "The prosecutor's comments must be evaluated in light of the defense argument that preceded it." *Darden,* 477 U.S. at 179, 106 S.Ct. 2464. During his summation, defense counsel sought to undermine the credibility of the People's witnesses and focus the jury's attention on perceived implausibilies in their testimony. For instance, at the beginning of his summation, counsel stated,

> ... I told you that this case was all about credibility and the believability of police witnesses ... Right here, in that box, the police have to face the music. That's the hot seat. It's very different from what happens on the street.

Tr. at 354. The prosecutor, in response to the summation by defense counsel, offered the jury reasons, including Gonzalez–Peña's confirmed lies to the Buffalo Police, why he was not a credible witness. Although the prosecutor was entitled to comment on the issue of credibility in response to defense counsel's argument, he should have refrained from making the comment about having the jury decide the case as a "credibility contest" between petitioner and the police. To the extent that that comment may have had the effect of shifting the burden of proof to the defense, it was improper.

When prosecutorial misconduct has occurred, the claim must be evaluated in light of (1) the severity of the alleged misconduct, (2) the curative measures taken, and (3) the likelihood of conviction absent any misconduct. *Blissett v. Lefevre,* 924 F.2d 434, 440 (2d Cir.), *cert. denied,* 502 U.S. 852, 112 S.Ct. 158, 116 L.Ed.2d 123 (1991). I find that the prosecutor's comments were highly inappropriate, but their severity is tempered by the fact that the remainder of his summation was unobjectionable. In addition, the court explained that summations did not constitute evidence and that the jury was free to reject the attorneys' arguments made during summation, thereby ameliorating any prejudice that may have accrued to petitioner. The court also explained the burden of proof always lay with the prosecution and never shifted to the defense. Finally, given the compelling evidence of Gonzalez–Peña's guilt, there is no reasonable probability that he would have been acquitted but for the prosecutor's improper remarks. *See, e.g., Strouse v. Leonardo* (finding that "absent alleged misconduct, given the overwhelming evidence of Strouse's guilt, he still would have been convicted.") (citing *United States v. Modica,* 663 F.2d 1173, 1181 (2d Cir.1981) (*per curiam*) ("[I]f proof of guilty is strong, then the prejudicial effect of the [prosecutor's] comments tends to be deemed insubstantial."), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982)).

For the foregoing reasons, counsel's alleged omissions did not deprive Gonzalez–Peña of his Sixth Amendment right to effective representation. The record of petitioner's criminal proceedings makes clear that he was ably represented by assigned counsel at trial. Counsel moved to strike evidence unfavorable to his client's position, such as the INS letters, and moved to dismiss the indictment based on a failure of proof. He vigorously cross-examined witnesses and presented a cogent defense theory-namely, that the evidence linking Gonzalez–Peña to the drugs found in the stairwell was too tenuous to support a conviction and that the arresting officers' testimony was inconsistent. Thus, the Appellate Division did not unreasonably apply governing Supreme Court precedent in concluding that petitioner's counsel provided constitutionally effective representation, nor was its holding contrary to such authority.

## B. Erroneous admission of letters to immigration authorities

■ Petitioner asserts that the trial court improperly allowed the prosecution to utilize two letters written by him to the INS in 1992 under the name of "Daniel Peña, a/k/a Freddy Gonzalez–Peña" ("the INS letters"). The substance of the letters is set forth in note 4, *supra*.

On direct appeal, the Fourth Department "reject[ed] the further contention of defendant that he was denied a fair trial by proof of two letters that he wrote while in prison." The court noted that "[d]efendant does not contest the relevancy of the letters to the forgery and criminal impersonation charges, and his contention that he was unduly prejudiced by such proof is purely speculative." *People v. Gonzalez–Peña,* 275 A.D.2d at 1007, 713 N.Y.S.2d 588.

The prosecutor requested permission to introduce the INS letters in order to demonstrate petitioner's motive in misrepresenting his identity, as well as to establish his true identity. At trial, the court ruled that, with respect to the forgery and criminal impersonation charges, the prosecution would be permitted to introduce evidence on its direct case that Gonzalez–Peña had been deported from the United States and then had re-entered the country illegally. Tr. at 29. The trial judge found that the evidence was admissible, although he expressed doubts about its evidentiary value. *Id.* at 30. The court reiterated that the prosecution was not permitted to introduce evidence as to any earlier convictions but could "bring in evidence that [defendant] was in detention of some sort at the time he wrote these letters and was being considered for deportation." *Id.*

Defense counsel argued that, because it was clear from the letters that petitioner was writing from a correctional facility, their admission would be contrary to the court's *Sandoval*[13] ruling that the jury was not permitted to hear evidence as to his prior convictions. The trial court disagreed, finding no inconsistency between its earlier ruling and the admission of the letters. *Id.* at 31. On direct appeal, the Appellate Division found no error in the receipt of the letters into evidence. *See People v. Gonzalez–Peña,* 275 A.D.2d at 1007, 713 N.Y.S.2d 588.

■ Federal habeas relief typically does not lie for alleged errors of State evidentiary law. *See, e.g., Estelle v. McGuire,* 502 U.S. at 67–68, 112 S.Ct. 475. Gonzalez–Peña's sole objection to the letters is that they "invited the jury to convict [him] of the drug possession charges ... upon the wholly improper basis that he had a propensity to commit crime." Attachment to Petition at 12 (Docket # 1). However, I find that Gonzalez–Peña has not substantiated his claim that the jury necessarily would assume that he had a previous conviction based on the contents of the INS letters.

As respondent notes, since the letters were addressed to the immigration authorities, the jury easily could have concluded that Gonzalez–Peña was incarcerated because he was present in the country illegally. More importantly, the letters were not material to Gonzalez–Peña's conviction in light of the substantial and convincing evidence of his guilt. Thus, I cannot find that their introduction denied him a fair trial. Thus, the Appellate Division's dismissal of this claim was neither contrary to, nor an unreasonable application of, clearly established Federal law.

## CONCLUSION

For the reasons stated above, Freddie Gonzalez–Peña's petition for a writ of ha-

---

13. *People v. Sandoval,* 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974).

beas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because Gonzalez–Peña has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED.**